IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

Frances E. Grady,              )    Case No. 7:13-cv-2020-GRA-JDA
                                )
                                )    **<u>REPORT AND RECOMMENDATION</u>**
       Plaintiff,           )         **<u>OF MAGISTRATE JUDGE</u>**
                                )
            v.               )
                                )
Spartanburg School District Seven,  )
Verotta Kennedy and Wanda Anderson, )
                                )
       Defendants.       )
_____)

This matter is before the Court on two motions to dismiss filed by Defendants. [Docs. 6, 7.] Plaintiff brings this action for civil conspiracy against the individual Defendants, Verotta Kennedy ("Kennedy") and Wanda Andrews ("Andrews" and together with Kennedy, the "Individual Defendants"). [Doc. 1.] Against Defendant Spartanburg School District Seven ("District 7" or the "District"), Plaintiff alleges race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); age discrimination pursuant to the Age Discrimination in Employment Act, as amended ("ADEA"); and disability discrimination and retaliation claims pursuant to the Americans with Disabilities Act of 1990, as amended ("ADA"). [*Id.*] Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C., this magistrate judge is authorized to review all pretrial matters in this case and to submit findings and recommendations to the District Court. District 7 seeks to dismiss Plaintiff's claims under the ADA and ADEA pursuant to Federal Rule of

Civil Procedure 12(b)(1).  Kennedy and Andrews move to dismiss the civil conspiracy claim against them pursuant to Rule 12(b)(6).

## BACKGROUND

Plaintiff was an employee of District 7 for 33 years.  [*Id.* ¶ 9.]  Her most recent position was as an Interventionist at Mary H. Wright Elementary School, under the direction of Kennedy, who served as principal there.  [*Id.*]  Plaintiff was diagnosed with cancer in June of 2009, which is now in remission.  [*Id.* ¶ 10.]  As a result of the cancer and shortly after she went into remission, Plaintiff was diagnosed with neutropenia, which can cause a low white blood cell count, weakened immune system and fatigue, among other symptoms.  [*Id.* ¶ 11.]

In July 2009, Plaintiff relayed to Andrews, the Assistant Superintendent for the District at the time of Plaintiff's employment, that Plaintiff was battling an infection related to her neutropenia.  [*Id.* ¶¶ 4, 12.]  Plaintiff alleges District 7 began making accommodations for her in July 2009 due to her diagnosis.  [*Id.*]  Plaintiff was excused from certain group functions and was transferred to the Interventionist position.  [*Id.* ¶ 13.]  Plaintiff believes District 7 informed the former principal of the school, Owens Jackson, that Plaintiff was moved into that role to accommodate her condition.  [*Id.*]  The Interventionist position allowed Plaintiff to work despite her disability because as an Interventionist she taught small groups of children for scheduled periods of time, she could sanitize her work space and monitor the children for signs of illness, the more controlled environment allowed Plaintiff to monitor her own health, Plaintiff could wear surgical masks when needed, and she could reschedule classes if she missed any time.  [*Id.* ¶ 14.]

2

When Kennedy replaced Owens Jackson as principal, Plaintiff immediately reported her neutropenia to Kennedy and related to Kennedy that the Interventionist position accommodated her needs. [*Id.* ¶ 15.] Kennedy requested that Plaintiff take on kindergarteners in the Intervention program but Plaintiff declined; Plaintiff also declined attending any field trips. [*Id.* ¶¶ 16-17.]

Shortly after Kennedy took over as principal, Plaintiff complained to Andrews that Kennedy was not properly carrying out her job responsibilities. [*Id.* ¶ 18.] Specifically, Plaintiff reported that Kennedy did not initiate a safety plan for the new school year, Kennedy was often late to meetings, Kennedy did not "properly assign" a special education teacher to the special education students, and Kennedy did not have a handbook in place prior to the start of the school year. [*Id.*] Andrews encouraged Plaintiff to continue to tell Andrews about Kennedy's shortcomings. [*Id.* ¶ 19.] In the spring of 2012, Kennedy announced at a staff meeting that she was aware that "someone was making complaints about her" and that she intended to find out who it was. [*Id.* ¶ 20.] Plaintiff was concerned about her job security but Andrews reassured her. [*Id.* ¶ 21.]

Prior to the commencement of the 2012-2013 school year, Kennedy informed Plaintiff that Plaintiff would be moved to a first grade teaching position because interventionists were being phased out at the school. [*Id.* ¶ 22.] Plaintiff informed both Andrews and Kennedy that she could not teach first grade because of her neutropenia, but was told she had no choice. [*Id.* ¶ 23.] As a result, Plaintiff was forced to go on leave without pay. [*Id.* ¶ 24.] Plaintiff alleges that District 7 hired a young African-American male as an interventionist at the school after she was transferred to the first

grade position.  [*Id.* ¶ 25.]  After Plaintiff filed her charge with the Equal Employment Opportunity Commission, she was denied a contract for the 2013-2014 school year.  [*Id.* ¶ 26.]  Plaintiff filed her Complaint with this Court on July 23, 2013.  [*Id.*]  Plaintiff claims race discrimination and retaliation under Title VII, violation of the ADA, and violation of the ADEA against District 7 and civil conspiracy against Kennedy and Andrews.  [Doc. 1.]

## APPLICABLE LAW

**Motion to Dismiss Standard[1]**

### *Rule 12(b)(1)*

A motion to dismiss under Rule 12(b)(1) examines whether the complaint fails to state facts upon which jurisdiction can be founded.  Fed. R. Civ. P. 12(b)(1).  The court may dismiss a case for lack of subject matter jurisdiction on any of the following bases: "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).  Generally, challenges to jurisdiction under Rule 12(b)(1) may be raised in two ways: "facial attacks" and "factual attacks."  *See Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir.

---

[1]    The Fourth Circuit has not resolved which of these rules, 12(b)(1) or 12(b)(6), applies to a motion to dismiss on the basis of Eleventh Amendment immunity. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 481 (4th Cir.2005) (stating in dicta that "Eleventh Amendment immunity does not limit a federal court's subject-matter jurisdiction"); *Andrews v. Daw*, 201 F.3d 521, 525 n. 2 (4th Cir.2000) ("Our cases have been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)."). In evaluating a defendant's challenge to subject matter jurisdiction, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.1999) (internal quotation marks and citations omitted).

1986), *overruled on other grounds by Sheridan v. United States*, 487 U.S. 392 (1988). A facial attack questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction; the court analyzes a facial attack as it would a motion to dismiss under Rule 12(b)(6) such that "[t]he allegations in the complaint are taken as true, and materials outside the pleadings are not considered." *Id.*

A "factual attack" challenges the truthfulness of the jurisdictional allegations in the complaint, *id.*, and the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213,1219 (4th Cir. 1982); *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987)).  To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists."  *Id.* (citing *Trentacosta*, 813 F.2d at 1559); *see also  Dira v. Deutch*, 149 F.3d 1167, 1998 WL 276236, at *1 (4th Cir. 1998) (unpublished table decision)  ("When such 'factual' challenges are asserted, a trial court may go beyond the allegations of the complaint, weigh the evidence, and satisfy itself as to its jurisdiction to hear the case.").

A dismissal should only be granted in those instances in which "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Richmond, Fredericksburg*, 945 F.2d at 768 (citing *Trentacosta*, 813 F.2d at 1558).  Typically, the burden of proving subject matter jurisdiction lies with the plaintiff, who asserts the jurisdiction.  *Id.*  "However, where a party challenges the subject matter jurisdiction of the court on the grounds that the party is an arm of the

state entitled to sovereign immunity, the burden of persuasion lies with the party asserting the immunity." *Hutto v. S.C. Ret. Sys.*, 899 F.Supp.2d 457, 466 (D.S.C. 2012) (citing *Woods v. Rondout Valley Cent. Sch. Dist. Bd. Of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006)).

**Rule 12(b)(6)**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support her claim and entitle her to relief. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d).

With respect to well-pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability.  *Twombly*, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting *Twombly*, 550

U.S. at 557)).  Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

**Defendants Kennedy and Andrews**

Plaintiff's sole claim against Kennedy and Andrews is one for civil conspiracy.  To successfully allege civil conspiracy in South Carolina, a plaintiff must show "(1) a combination of two or more persons [who join], (2) for the purpose of injuring plaintiff, and (3) caus[e] plaintiff special damage."  *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. App. 2009).    "The gravamen of the tort is the damage resulting to plaintiff from an overt act done pursuant to a common design."  *Id.*  A count of civil conspiracy must allege other acts in furtherance of the conspiracy besides those alleged in other counts of the complaint.  *Id.*  The damages alleged must also go beyond those alleged in the other causes of action.  *Id.*  Special damages are "elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct."  *Id.*  As long as sufficient facts are alleged to make out a prima facie civil conspiracy claim, the plaintiff does not have to explain all of the details of the conspiracy in [her] complaint. *Springer v. Pelissier*, Civil Action 6:10-CV-01303-JMC, 2011 WL 2601895 (D.S.C. July 1, 2011) (citing *Charles v. Tex. Co.*, 192 S.C. 82, 5 S.E.2d 464, 472 (1939)).

Kennedy and Andrews argue that Plaintiff has not alleged an overt act they did in furtherance of the conspiracy, and that she cannot show that she suffered special

damages.  [Doc. 6-1.]  As to the overt act requirement, Kennedy and Andrews assert that Plaintiff's claim cannot survive because it is not supported by additional facts independent of the other causes of action in the Complaint.  [Doc. 6-1 at 5.]  In her Complaint, Plaintiff pleads that "Defendant Kennedy, Andrews and others met at various times and places, schemed, conspired and planned in secret – outside the scope of their District duties and supervisory roles – to have Plaintiff eliminated as an Interventionist because they disliked her as a person and intended to harm her."  [Doc. 1 ¶ 51.]  Plaintiff alleges further that Kennedy and Andrews "used their respective positions of authority to perpetuate their personal vendettas against the Plaintiff.  They were threatened by the Plaintiff's knowledge of improper activities authorized and carried out by the Individual Defendants and others, including Kennedy's numerous deficiencies as Principal and supervisor."  [*Id.* ¶ 53.]    The Court finds that these facts are sufficient to meet the allegation requirements of an overt act in a civil conspiracy.

In *Howard v. Allen University*, which Individual Defendants cite at length in support of their special damages argument *infra*, the plaintiff alleged in his complaint that "Young and Wilson conferred and discussed on numerous occasions how to injure Plaintiff personally and in his employment."   Civ. Action 3:11-2214-MBS-SVH, 2012 WL 3637754 (D.S.C. Feb. 27, 2012) *report and recommendation adopted*, Civ. Action 3:11-2214-MBS-SVH, 2012 WL 3637746 (D.S.C. Aug. 22, 2012).   The court found this statement gave sufficient factual support to the plaintiff's civil conspiracy claim and was separate and apart from the other facts alleged in the complaint.   *Id.*   The Court finds the same analysis applicable here.   Unlike the plaintiff in *Springer v. Pelissier*, which Defendants rely upon in arguing that Plaintiff's Complaint is insufficient, Plaintiff here

has alleged some facts separate and apart from the other facts in the Complaint to state a claim for civil conspiracy.  *See Springer*, 2011 WL 2601895 at *2.  Plaintiff alleges that Kennedy and Andrews, outside the scope of their employment, met and planned on how to dismiss Plaintiff because they did not like Plaintiff and because she made complaints against Kennedy.  Plaintiff alleges that Kennedy and Andrews met outside of District parameters and conspired to harm Plaintiff because of Plaintiff's knowledge of inappropriate activities that Andrews and Kennedy were perpetuating.  The Court finds that Plaintiff has met the requirement of pleading an overt act in support of her claim of civil conspiracy.

Next, Andrews and Kennedy argue that Plaintiff has not sufficiently pled special damages.  As discussed, special damages alleged for a civil conspiracy cause of action must go beyond those alleged in other causes of action.  *Hackworth,* 682 S.E.2d at 874.  The Fourth Circuit has counseled that "damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting from the other claims."  *Parkman v. Univ. of S.C.*, 44 Fed. App'x. 606, 620 (4th Cir. 2002) (unpublished).  Moreover, Federal Rule of Civil Procedure 9(g) requires that "if an item of special damage is claimed, it must be specifically stated."

The Individual Defendants argue that Plaintiff's allegations of special damages are "amorphous" and "merely repeat[] the same damages alleged in her discrimination and retaliation claim."  [Doc. 6-1 at 6.]  Plaintiff counters that the special damages alleged in her civil conspiracy claim are separate and distinct from her other claims because the damages in her other claims are "exclusively set forth against the Defendant School District and not the Individual Defendants; as such, they are not

duplicative." [Doc. 11 at 8.]  Moreover, Plaintiff argues that the damages against Kennedy and Andrews are for "being ostracized and singled out among her colleagues and peers," for which she requests personal and emotional damages as well as punitive damages. [*Id.*] The Court finds these allegations sufficient to plead special damages.

Unlike *Howard*, upon which the Individual Defendants rely in support of their argument that Plaintiff has not established special damages, Plaintiff here has not pled the same damages in alternative claims.  In *Howard*, the plaintiff pled a civil conspiracy claim and, in the alternative, a defamation claim.  *Howard*, 2012 WL 3637754 at *8. The damages for the two claims were identical, leading the court to determine that plaintiff's complaint did not meet the requirements for special damages set out in *Hackworth* and *Parkman*.  *Id.*  Here, however, Plaintiff has claimed separate damages against different defendants in the civil conspiracy claim and for different acts of the Individual Defendants (as determined by this Court's finding that Plaintiff sufficiently pleaded a separate overt act in this claim).  Plaintiff has alleged that these emotional damages came from being ostracized from her peers, distinct from the emotional damages of losing her job.  These damages could also be termed "aggravated damages," which are generally sufficient to satisfy the requirement of pleading special damages.  *See Little v. Brown & Williamson Tobacco Corp.*, Civil Action 2:98-1979-23, 1999 WL 33291385 at *14 (D.S.C. Mar. 3, 1999).  The Court is mindful that such distinction may be difficult for Plaintiff to draw and prove on summary judgment or at trial, but that is not the purview of the Court on a motion to dismiss.  Therefore, based on the foregoing analysis, the Court recommends denying Andrew and Kennedy's motion to dismiss.

**Defendant Spartanburg School District Seven**

### *Application of Eleventh Amendment Immunity to School District*

The Eleventh Amendment prevents a federal court from entertaining a suit brought by a citizen against his own state, *Hans v. Louisiana*, 134 U.S. 1 (1890), or against an instrumentality of the state considered an "arm of the State[.]" *Regents of Univ. of Calif. v. Doe*, 519 U.S. 425, 430 (1997). "Eleventh Amendment immunity has attributes of both subject matter jurisdiction and personal jurisdiction." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005). Like subject matter jurisdiction, it may be raised at any time but it may also be waived by the state like personal jurisdiction. *Id.* at 481. The United States Court of Appeals for the Fourth Circuit has articulated a non-exhaustive list of four factors to be considered when determining whether or not a state-created entity is an arm of the state, and thus entitled to protection from suit by the Eleventh Amendment. *S.C. Dept. of Disabilities and Special Needs v. Hoover Univ. Inc.*, 535 F.3d 300, 303 (4th Cir.2008). These factors are:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;[2] (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;[3] (3) whether

---

[2]    Previously, the "state treasury" factor was viewed as the most important, if not the determinative factor. *See Cash*, 242 F.3d at 223 (citing agreement among "the vast majority of Circuits" that "the State Treasury factor is the most important factor to be considered") (internal citations omitted). The Fourth Circuit has acknowledged, however, that the first factor may no longer outweigh the remaining factors. *U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 n. 3 (4th Cir. 2012) (*citing Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743, 765 (2002) ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.")).

[3]    District 7 argues that these individual factors such as who appoints the directors or officers, who funds the entity and whether the State retains a veto over the entity's actions are inapposite here. As discussed below, the Court disagrees.

the entity is involved with State concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*Id.* (internal citations and alterations omitted); *see also Cash v. Granville Cnty. Bd. Of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001) (applying the same factors in a school district context). "These factors endeavor to draw the line between 'a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego.' " *U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012)(internal citations omitted).  The treasury inquiry is dispositive—if a state's treasury will be impacted, courts must draw a conclusion of Eleventh Amendment immunity.  *Cash*, 242 F.3d at 223.  However, if the treasury is not impacted, the remaining three factors must be analyzed to determine whether a judgment against the government entity would "adversely affect the dignity of the State as a sovereign and as one of the United States."  *Id.* at 224.  Therefore, the district court must explicitly perform this analysis before making a ruling on an Eleventh Amendment immunity defense.  *Id.* at 581.

Contrary to the District's assertion, the question of whether the school district is an arm of the state for purposes of Eleventh Amendment immunity analysis has not been settled in this district.  (*Compare, e.g., Eldeco, Inc. v. Skanska USA Building, Inc.*, 447 F.Supp.2d 521 (D.S.C. 2006)*, Calef v. Budden*, 361 F.Supp.2d 493, 497 (D.S.C.2005), *Smith v. School District of Greenville County*, 324 F.Supp.2d 786, 796 (D.S.C.2004),and *Stewart v. Laurens County School District*, 1992 WL 12014673, at *7 (D.S.C. Oct.2, 1992) (unpublished)(finding that school districts were arms of South Carolina (the "State") and thus immune from suit) with *Child Evangelism Fellowship of*

13

*South Carolina v. Anderson School Dist. 5*, 438 F.Supp.2d 609 (D.S.C. 2006) (reversed and remanded on other grounds by *Child Evangelism Fellowship of South Carolina v. Anderson School Dist. 5*, 470 F.3d 1062 (4th Cir. 2006)), *Green v. Clarendon School District Three*, 923 F.Supp. 829, 850 (D.S.C.1996), and *Adams v. Richland School District One*, 412 F.Supp. 647, 651 (D.S.C.1976) (finding that the school districts were not arms of the State for purposes of Eleventh Amendment immunity)).  Thus, the Court must make a factual determination in this case regarding the applicability of Eleventh Amendment immunity by considering the above mentioned *Hoover* and *Cash* factors. The Court ordered the parties to supplement their briefs as to this issue [Docs. 20, 21]. As noted above, with the assertion of immunity, the District bears the burden of demonstrating the Court lacks subject matter jurisdiction. *Hutto*, 899 F.Supp.2d at 466.

### A.  Impact on the State Treasury

Plaintiff argues that there will be no impact on the state treasury with a judgment in this case, or in the alternative requests discovery on the issue.  The District makes a compelling argument that much of District 7's budget comes from the state through the Education Finance Act of 1977, S.C. Code § 59-20-10 et seq., and the 1984 Education Improvement Act, S.C. Code Ann. § 59-21-420 et seq.  However, the Court agrees with Plaintiff that, without more fulsome discovery, the Court "is unable to reasonably consider this factor."  *Smith*, 324 F.Supp.2d at 792.  The Court has considered the affidavit of Missy Campbell [Doc. 20-1], under the dictates of Rule 12(b)(1), which allows the Court to consider evidence on subject matter jurisdiction without converting the motion to one for summary judgment.  *See Richmond, Fredericksburg*, 945 F.2d at 768.  However, the affidavit is insufficient to demonstrate that the state treasury would

14

be implicated.  Ms. Campbell avers that she is the Chief Financial Officer for District 7.
[Doc. 20-1 ¶ 1.]  She testifies that the General Fund is the District's chief operating fund,
which consists of state, local and federal revenues.  [*Id.* ¶ 2.]  State funds comprise half
of the General Fund.  [*Id.* ¶ 3.]  Funds remaining in the General Fund at the end of the
year become part of the General Fund balance, and any adverse judgment from
litigation would be paid from that balance.  [*Id.* ¶ 4.]  Therefore, Ms. Campbell "believe[s]
the payment of a judgment against the School District would be funded, at least in part,
with state funds."  [*Id.* ¶ 5.]

District 7 points to *Martin v. Clemson Univ.* to support its position that any
payment from state funds thereby negatively impacts the state treasury.  654 F.Supp.2d
410 (D.S.C. 2009).  However, the district overlooks an important distinction in that case:

> The South Carolina Tort Claims Act ("SCTCA") specifically defines
> Clemson (and all other state-supported colleges and universities) as the
> "State" and a "state agency."  *See* S.C. Code Ann. § 15-78-30(a) and (e).
> That Act makes the state and its agencies liable in tort and provides for
> recovery of damages up to a maximum of $300,000 per occurrence on
> state law tort claims.  *Id.* § 15-78-120(a)(1). The state, therefore, would
> clearly be liable for any judgment for damages entered against Clemson
> on one or more of the plaintiff's tort claims.

*Id.* at 418 (D.S.C. 2009).[4]  While the *Martin* court did note that any portion of the
judgment not paid by insurance would have to be paid by the "state or Clemson from
public funds, thereby negatively impacting the state treasury," as noted, the State would
be liable for any such judgment and Clemson is considered to be a state agency.  This
case is more analogous to the Fourth Circuit's analysis in *Cash*.  There, unlike in *Martin*,
the state was not legally obligated to pay any judgment against the school board.  *Cash*,

---

[4]     The Court notes that the availability of insurance to cover some or all of a potential judgment
against District 7 does not affect the District's entitlement to Eleventh Amendment immunity.  *Martin*, 654
F.Supp.2d at  418 (citing *Regents of the Univ. of Calif.*, 519 U.S. at 431).

242 F.3d at 224.  District 7 has not asserted that the State would be obligated to pay any judgment here.  Nor has the District shown that the "State's allocation of funds would increase to cover a judgment . . . ."  *Id.*  The only argument that District 7 has made is that leftover state funds, not allocated for litigation purposes, may be moved into a general slush fund from which a judgment may be paid.  The Court finds that, without more, this "speculative, indirect and ancillary impact on the State treasury that a judgment against the School Board in this case would have does not give rise to Eleventh Amendment protection."  *Id.* at 225.

Therefore, for purposes of this motion,[5] the Court will assume that there would be no impact on the state treasury, which supports Plaintiff's argument that sovereign immunity is not applicable.  Because the court assumes that the state treasury is not implicated, "the question of whether the School Board is entitled to Eleventh Amendment immunity will turn on whether [Plaintiff's] suit against the School Board would nonetheless impinge upon the sovereign dignity of [South] Carolina as a State within our federal system," and the Court proceeds to consider the remaining three factors.  *See id.*

### B.   State Control

The second inquiry is the degree of control that the State has over District 7 and conversely, the amount of autonomy exercised by the District.  The District alleges that it "derives its existence, maintenance and support from the state." [Doc. 20 at 6.]  The district reports to three state authorities: the General Assembly, the State Department of Education and the State Board of Education. [*Id.*], S.C. Code §§ 59-1-40, 59-5-60, 59-

---

[5]     The Court would be inclined to grant limited discovery on the treasury issue if requested by District 7.  At that juncture, if the Court determined Eleventh Amendment immunity were appropriate, the Court will consider whether Title II of the ADA is a valid abrogation of Eleventh Amendment immunity.

5-65.  District 7 points the Court toward the district court's analysis in *Smith v. School District of Greenville County*, which gave a thorough overview of the relevant State statutes that exert control over school districts in the State.   *Smith*, 324 F.Supp.2d at 793-95.  The *Smith* court reasoned

> Plaintiffs argue that heavy governmental regulation over the school districts is not indicative of control by the government. The Court disagrees. There are many examples of businesses that are extensively regulated by the government: the drug industry, the medical device industry, the tobacco industry, the railroad industry, the insurance industry and the utility industry, to name a few. However, in these industries, unlike in the instant case, the government does not generally control the hiring and firing of employees, the purchase and acquisition of property, and the construction of buildings. Nor does the government have the power to assume the management of such industries. That is, as a general rule, unlike the industries that the government merely regulates, the State controls those agencies in which it has delegated a portion of its own responsibilities.

*Id.* at 795.  District 7 also urges the Court to rely primarily on *Smith* because it was a defendant in that case, and thus argues that it has already been found to enjoy Eleventh Amendment immunity and this Court should not disrupt that finding.

In contrast to *Smith*, the district court in *Child Evangelism* followed the control analysis that the Fourth Circuit set out in *Md. Stadium Auth. V. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005).  *Child Evangelism*, 438 F.Supp.2d at 619.  In gauging the state's control over the school district, the court considered "(1) whether the state retains a veto over the entity's actions; (2) the origins of the entities funding; and (3) who appoints the entities directors."  *Id.* (quoting *Ellerbe Becket*, 407 F.3d at 251, n. 10 & 261 (internal quotation marks omitted).  District 7 argues that these individual factors should not apply because these "narrow sub-factors" concern the application of the Eleventh Amendment to multi-state Compact Clause entities rather than single-state

created entities like the district.  [Doc. 20 at 4.]  The Court disagrees.  The Fourth Circuit

has applied these factors in single-state created entity cases without any such

distinction.  *See S.C. Dept. of Disabilities and Special Needs*, 535 F.3d at 303; *Ellerbe*

*Becket Inc.*, 407 F.3d at 260.   Further and more importantly, the Fourth Circuit

counseled in *Ellerbe Becket*,

> The Supreme Court has noted that "[g]auging actual control ... can be a
> 'perilous inquiry,' 'an uncertain and unreliable exercise.' " *Hess v. Port-*
> *Auth. Trans-Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d
> 245 (1994). We believe the three factors analyzed in *Lake Country*
> *Estates* make for a less perilous journey. *We encourage district courts to*
> *analyze these three factors rather than engaging in a free-wheeling inquiry*
> *into the "autonomy" of the state entity in question.*

*Ellerbe Becket Inc.*, 407 F.3d 255, 262, n. 10 (4th Cir. 2005) (emphasis added).  The

Court views this as very clear guidance from the Fourth Circuit that these factors are to

be applied.   Therefore, the Court finds the analysis in *Child Evangelism* to be more

compelling than that in *Smith*, which preceded *Ellerbe Becket*.

Applying the first factor, like in *Child Evangelism*, the District has not pointed to

any specific provision to support the argument that the state retains any veto power

over the District.  Again, the District relies on the court's finding in *Smith* that the State

exercises pervasive control over the school districts.   However, "the *Smith* court

analyzed the relationship between the State and its school districts for actual control

and did not analyze the control factors under the sub-factors set forth in *Ellerbe Becket*

or explicitly discuss the State's power to veto decisions of the District.  As such, the

District's mere reference to *Smith* does not establish that the State has the power to

veto the District's decisions."  *Child Evangelism*, 438 F.Supp.2d at 619.  In applying the

Fourth Circuit's analysis in *Cash*, the *Child Evangelism* court found that while school

districts in North Carolina may have more autonomy than those in South Carolina, South Carolina school districts are "independent bod[ies] that can sue and be sued, purchase liability insurance and retain private counsel, as it has in this case, without permission of the South Carolina Attorney General." *Id.* (citing *Cash*, 242 F.3d at 225; S.C. Code Ann. §§ 59-17-10 (1976); 1-11-140 (1986)).  Moreover, the court found that the multitude of regulations cited in *Smith* were "more akin to curriculum or certification requirements to ensure base levels of performance and education across the State," which the Fourth Circuit in *Cash* found to be insufficient to warrant a conclusion of control and Eleventh Amendment immunity.  *See id.* at 620.

This Court agrees with the *Child Evangelism* court's analysis.  District 7 is a separate corporate body that is able to sue and be sued, and has hired its own private counsel for this suit.  The Court finds the control argument (and Eleventh Amendment immunity) to be particularly problematic in the context of the school districts, many of which have sued the State.  *See, e.g. Abbeville Cnty. Sch. Dist. v. State of South Carolina*, 515 S.E.2d 535 (1999).  While the *Child Evangelism* court acknowledged that the State did have power over certain decisions, such as requiring prior approval before the purchase or sale of real property, "[i]n sum, the court finds that, despite South Carolina's veto power over some aspects of the District's affairs, the District has failed to show that the State's veto power deprives it of the substantial autonomy it has in administering the policies and standards of the State."  *Child Evangelism*, 438 F.Supp.2d at 620.  The District here does not even appear to dispute this finding, instead focusing its argument on the irrelevance of applying the *Ellerbe Becket* factors.

Having dispensed with that argument, the Court joins *Child Evangelism* in finding that the District does not meet the first prong of the control analysis.

The remaining two factors of funding of the District and appointment of the Board also weigh against a finding of state control. The District has acknowledged that only half of its funding comes from the state. [Doc. 20-1 ¶ 3.] Finally, the school board is appointed by the county board of education and not by the state. S.C. Code § 59-19-40; *Child Evangelism*, 438 F.Supp.2d at 620. Therefore, the Court finds that the District retains sufficient autonomy such that it is distinct from the State and a judgment against it would not affront the dignity of the State.

### C. State-Wide Concern

The case law has been uniform in finding that school districts deal with local and not statewide concerns. *Cash*, 242 F.3d at 226; *Smith*, 324 F.Supp.2d at 795; *Child Evangelism*, 438 F.Supp.2d at 620. As the Fourth Circuit stated in *Cash*, though *education* is a statewide concern, a school district's jurisdiction and concern are "clearly" local. *Cash*, 242 F.3d at 226. Therefore, this factor weighs against a finding of immunity.

### D. Treatment under State Law

The final factor, treatment under state law, "overlaps with [the] analysis of State control versus local autonomy." *Cash*, 242 F.3d at 226. In support of this prong, the District again reiterates that the General Assembly has power and discretion over the school districts and contrary to the provisions of the Home Act Rule, which govern counties, exercises substantial control over the districts. [Doc. 20 at 10.] As noted

above, the Court finds it compelling that South Carolina school districts are considered autonomous entities.  As noted in S.C. Code. Ann. § 59-17-10 (1976),

> Every school district is and shall be a body politic and corporate, by the name and style of _____ (a descriptive name may be designated by the county board of education or legislative act) School District No _____ (such number may be designated by the county board of education or legislative act), of _____ County (the name of the county in which the district is situated), the State of South Carolina. In that name it may sue and be sued and be capable of contracting and being contracted with to the extent of its school fund and holding such real and personal estate as it may have or come into possession of, by will or otherwise, or as is authorized by law to be purchased, all of which shall be used exclusively for school purposes.

The districts may sue and be sued (including making suits against the state), make contracts, own property, carry liability insurance and hire their own counsel.  *See Child Evangelism*, 438 F.Supp.2d at 620-21.   Moreover, Plaintiff points out that school districts have been statutorily defined as political subdivisions, like counties, rather than agencies of the State.  The definitions of the Tort Claims Act define "state" as "the State of South Carolina and any of its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, including the South Carolina Protection and Advocacy System for the Handicapped, Inc., and institutions, including state-supported governmental health care facilities, schools, colleges, universities, and technical colleges."  S.C. Code Ann. § 15-78-30(e).  In contrast, "political subdivision" is defined as "the counties, municipalities, school districts, a regional transportation authority established pursuant to Chapter 25 of Title 58, and an operator as defined in item (8) of § 58-25-20 which provides public transportation on behalf of a regional transportation authority, and special purpose districts of the State and any agency, governmental health care facility, department, or subdivision thereof."  *Id.* § (h).  While

the Court agrees with the District that such language in the Tort Claims Act[6] is insufficient to establish that the school district is not an arm of the state, when weighed with all the other evidence described above, the Court concludes that the District is not treated as the State's alter ego and thus the District fails to meet the final prong of the analysis.  In light of the foregoing, and in applying the Fourth Circuit's precedents in *Cash* and *Ellerbe Becket*, the Court determines that at this juncture and on the record before it, the District is not entitled to Eleventh Amendment immunity.

## CONCLUSION

Wherefore, based upon the foregoing, the undersigned recommends that District 7's Motion be DENIED and the Individual Defendants' Motion be DENIED.

IT IS SO RECOMMENDED.

Jacquelyn D. Austin
United States Magistrate Judge

November 25, 2013
Greenville, South Carolina

---

[6]     While the District protests that the South Carolina Torts Claim Act's definitions are not sufficient to prove the District is not entitled to immunity, the Court does note that *Martin*, upon which the District cites heavily, relies upon the definitions in the South Carolina Torts Claim Act in determining that Clemson University is entitled to Eleventh Amendment immunity because of the potential impact on the State treasury.  *Martin*, 654 F.Supp.2d at 418.

22